Evelyn V. Keyes, Justice
A jury convicted appellant, Maurice Prince, of the first-degree felony offense of continuous sexual abuse of a child and assessed his punishment at twenty-five years' confinement.[1] In his sole issue on appeal, appellant contends that the trial court erred by admitting a video recording of the complainant's forensic interview under the rule of optional completeness.
We affirm.
Background
Appellant has a large extended family, including his niece, Lauren, and Lauren's daughter, Tiffany, the complainant.[2] Tiffany was born in December 2001 and she was sixteen at the time of the trial in February 2018. She testified that appellant is her maternal grandmother's brother and that she has known appellant her entire life. Tiffany characterized her family as close-knit, and she testified that appellant often spent time with her and her siblings. Tiffany would typically see appellant "throughout the week or like every weekend, every other weekend."
At one point, Tiffany offered to clean appellant's house for him. In return, appellant would take Tiffany shopping and give her spending money. For her thirteenth birthday, in December 2014, appellant bought Tiffany a sewing machine. After Tiffany told appellant that she wanted an iPhone, appellant told her that he would pay the bill for the phone if she cleaned his house. She stated that she was in sixth grade or the beginning of seventh grade when she got this phone, and she estimated that she was eleven or twelve years old at the time. Tiffany could not place or receive calls on this phone, but she used it for its camera capabilities. Tiffany and her paternal grandmother later discovered that appellant had placed a block on the phone so that he was the only one who could call her on that phone.[3]
Tiffany stayed over at appellant's house in Pasadena one weekend, which was not out of the ordinary. Typically, when Tiffany spent the night at appellant's house, she would sleep on the couch, but on this *564 occasion, appellant told her to sleep in his bed with him. Appellant told her to take her pants off because he did not like having jeans in his bed. After Tiffany fell asleep, she felt appellant reach under her clothes and touch her vagina with his hand. Tiffany started moving around in the bed to make it appear as though she were waking up so appellant would no longer touch her. Appellant kept trying to touch her for around three minutes, but "he eventually gave up" when she kept moving around.[4]
Tiffany testified that there were other incidents where appellant touched her vagina and her breasts. She stated that "when I'd go over there [to appellant's house], it would start happening more and more and it would get worser, until eventually like I would be woke when he would do it and he would try to like persuade me to do things." When asked if she remembered an incident that occurred when she was awake, she testified:
There was this one time he bought me a scooter and the price of it was high. He told me in the store, he was like, If I get this for you, you're going to have to let me put it in, his penis inside my vagina. And I told him I didn't want it [the scooter] anymore, and I told him to put it back. He was like, No, you're going to get it. And then we got in the car, I started crying. He called me a crybaby because I was crying. And when we got home, he tried to force his penis inside of my vagina.
On this occasion, appellant also performed oral sex on Tiffany. Tiffany estimated that this incident occurred during the school year, before Christmas in 2014. Tiffany testified that she would go to appellant's house to clean about every other week and that appellant would sexually abuse her "[e]very time [she would] go over there." She stated that she stopped going over to appellant's house around the middle of her seventh-grade year and that the abuse continued until she stopped going to his house.
Tiffany also testified that, on one occasion, when she was twelve or thirteen, appellant sexually abused her at her house. Tiffany had asked her mother for a lock for her bedroom door, but her mother did not have the money for a lock. Appellant agreed to purchase a lock and put it on Tiffany's door, but he told her that "the only way [she] would have a lock is if he could have a key." On one weekend, appellant, along with other extended family members, spent the night at Tiffany's house. He unlocked her bedroom door with his key and started looking through some of his bags, which he had placed at the foot of Tiffany's bed. Tiffany and two of her cousins-Quincy and Alice-were asleep in her bed. Appellant then came over to the bed, moved the blanket off of Tiffany, pulled her underwear down, and touched her vagina. Tiffany started moving around a lot in the bed, and appellant walked out of the room.
Tiffany stated that she did not tell anyone about the abuse because appellant had told her not to tell anyone, she was scared that no one would believe her, and she thought that the disclosure of the abuse would hurt her mother, who was very close to appellant. Eventually, she told her cousin, Rebecca, "because [she] was tired of going through it," but she told Rebecca not *565 to tell anyone, and the abuse continued.[5] Tiffany also stated that she did not tell her mother what was happening, but she did start trying to make excuses not to go over to appellant's house, such as stating that she wanted to spend more time with her cousins on the weekend. Appellant rarely allowed Tiffany's cousins to come to his house while she was there, telling her that "he doesn't need all those kids in his house while [she is] trying to clean." As a result, it was usually just Tiffany and appellant alone at his house.
Around the middle of Tiffany's seventh-grade school year, Rebecca told her mother about the abuse. Rebecca's mother called Lauren, Tiffany's mother, and asked to have a meeting, and the four of them-Tiffany, Lauren, Rebecca, and Rebecca's mother-met at Tiffany's house and Lauren was made aware of the abuse. Lauren immediately called the police. Tiffany spoke with police officers, and she also had a medical exam and participated in a forensic interview. Tiffany agreed with the State that she told the forensic interviewer "what [she] just told us today [at trial]."
On cross-examination, defense counsel asked Tiffany about her forensic interview. They had the following exchange:
Q. And at that time, whenever you were in the interviews-in the interview, did the interviewer make you feel comfortable enough to talk to her?
A. Yes, ma'am.
Q. And did you tell her as much information as you could about what occurred?
A. Yes, ma'am.
Q. Did you tell her everything that occurred?
A. Yes, ma'am.
Q. So when you talked to her, you didn't leave anything out?
A. No, ma'am.
Q. Now, when you-do you recall your conversation with her?
A. Yes, ma'am. I just-I told her everything that happened.
Q. Okay. Now, isn't it true in your conversation with her that you expressed that there were four and five incidents?
A. No, ma'am.
Q. Now, in the interview, the interviewer asked you questions about what body parts were touched, correct?
A. Yes, ma'am.
Q. And did she ask you about specific body parts?
A. Yes, ma'am. She gave me objects to explain.
Q. Okay. And during that time in which you told her everything, you told her that there was never a touch-never a time that anybody has ever touched you on your boobs, correct?
A. Yes, ma'am.
Q. But today, you said there was a touch on the boobs?
A. Yes, ma'am.
Defense counsel also asked Tiffany, "[I]sn't it true that you said-you told the [forensic] interviewer that you told [Rebecca] the very first time [the abuse] started?" Tiffany responded, "No, ma'am." Defense counsel then asked, "So if the interviewer testified differently, that would be a surprise to you?" Tiffany stated, "Yes, ma'am."
*566 Tiffany also described, on cross-examination, an incident that had occurred one weekend when she was eleven or twelve and she was staying over at appellant's house with her older brother, James, and one of her cousins, Heather.[6] On this occasion, all three children were sleeping on a couch in appellant's living room. Tiffany was sleeping near the arm of the couch, and appellant bent down and touched her vagina with his hand. Neither James nor Heather woke up while this was occurring, and Tiffany did not tell them about it the next day. On re-direct examination, the State asked Tiffany if appellant ever forced her to touch him, and she testified that, on one occasion at his house, he forced her to shave his penis with clippers.
Lauren testified that, prior to the discovery of the abuse of Tiffany, she had a very close relationship with appellant, who was like a father-figure to her. When Lauren was going through a divorce from Tiffany's father in 2011, when Tiffany was around ten years old, appellant noticed that the divorce was having an effect on Tiffany, and he "stepped in" and started spending more time with her, acting as both a father and a grandfather for Tiffany. Lauren testified that after Tiffany started cleaning appellant's house, when she would return home, she would stay in her bedroom with the door closed and she wanted to be alone. At one point, after having a conversation with Tiffany's grandmother that concerned her, Lauren asked Tiffany if she had anything she wanted to say and if appellant ever touched her inappropriately, and Tiffany "shut down" and said no. Lauren then called appellant, who denied the occurrence of anything inappropriate, and Lauren "let it go."
Lauren testified that she learned of the abuse in April 2015 when Rebecca's mother called her and asked if she and Rebecca could meet with Lauren and Tiffany to discuss something. She stated that Tiffany was "hysterical," "broke[n]," and "so hurt" when she disclosed the abuse. Lauren called appellant and told him what Tiffany had disclosed, and he "instantly started saying she was lying." Lauren then called the police.
Tiffany's cousin Quincy testified that her sister Alice and she would often sleep over at Tiffany's house, and appellant would also stay over as well. On one occasion when Quincy, Alice, and appellant were all staying over at Tiffany's house, when Tiffany was in sixth or seventh grade, appellant had placed his luggage in Tiffany's room. Before the three girls had gone to sleep, Tiffany had locked the door to her room. In the middle of the night, Quincy, who described herself as a light sleeper, heard someone unlock the door, and she saw appellant come in the room and go over to his luggage. Appellant then walked over to Tiffany's side of the bed and lifted up the bedcovers. Tiffany started moving around, and appellant left. After appellant left, Quincy raised the covers and she could see that Tiffany's clothes were "like fumbled with, messed with a little bit." She saw that Tiffany's tights had been pulled down and her underwear was visible, but when the girls had gone to sleep earlier, Tiffany's clothes had been pulled up and "[n]othing was showing."
Quincy did not say anything about this incident to Tiffany or to any adults, stating,
I'm thinking this is our uncle, he would never do nothing to us like that, nothing *567 like that. And then she's always around him, like always around him. So I never like thought in my mind that if her mom allowed her to be around him that he will do something like that to her.
When asked what did she think had happened, Quincy testified, "I thought that he messed with her, but I did not want to just accuse him of doing something like that because she's always around him and I didn't want it to start up [any] drama." Quincy stated that she finally disclosed what she had seen when Tiffany's brother James called her during the pendency of the case against appellant, "around the year they found out about the whole situation." Quincy then had a conversation with Tiffany about what she had seen.
Dr. Angela Bachim, a pediatrician at Baylor College of Medicine and Texas Children's Hospital who also works with the Children's Assessment Center, conducted Tiffany's medical examination. Dr. Bachim stated that Tiffany was "very anxious" during the exam, and Bachim had to "start and stop several times" during the course of the exam. Tiffany told Dr. Bachim that she "was molested by [her] uncle," whom she identified as appellant. Tiffany did not have any injuries, but she did have a "deep notch" at the seven o'clock position on her hymen. Dr. Bachim testified that current research suggests that a notch of this type could support the occurrence of abuse, but it has also been found in girls who are not sexually active and have never been abused, so she could not "call it an injury for sure." She called this an "indeterminate finding." Dr. Bachim testified that it is rare to see signs of past physical trauma in children who have been sexually abused because "[m]ost children wait weeks, months, years before they tell anybody, if ever," and by that point, any injuries have typically healed. She stated, "And so whenever we see the kids weeks, month[s], years after something has happened and they have a normal exam, it doesn't mean that nothing happened. What they say happened is the most important thing."
The trial court admitted a copy of the report Dr. Bachim made following the exam. This report included Tiffany's statements that appellant touched her "private area, [her] middle part," that he did not touch her anywhere else, that he touched her with "[h]is finger, and sometimes his middle part," that he had done this "since [she] was 10," that the last time he touched her was around her most recent birthday, that he "told her to touch his private part," and that she did so with her hand. The report also reflected that when Dr. Bachim asked Tiffany if she knew if appellant had touched anyone else inappropriately, Tiffany responded, "I don't know, but when he was telling me not to tell nobody, he said, 'Don't lie to me because I've been doing this for many a years [sic].' "
Claudia Gonzalez conducted Tiffany's forensic interview at the Children's Assessment Center. Gonzalez testified concerning the general forensic interview procedure, the questioning techniques used and the importance of avoiding leading questions, and concepts including grooming and blended memories, "where the abuse has happened for such a long time that it becomes either repetitive or the same that it's difficult to establish single incidents of abuse and gathering all of those details at once." On direct-examination, Gonzalez did not state exactly what Tiffany said during the forensic interview. Instead, she testified that Tiffany disclosed sexual abuse by a single perpetrator, that Tiffany "provided several kinds of sensory details" about the abuse, and that she had no concerns about the interview. The State did not offer the video recording of the forensic interview at this time.
*568 On cross-examination, defense counsel had the following exchange with Gonzalez:
Q. And did you also-during the course of the interview, did you ask her at any point if all the information she gave you was everything, like if she gave you all the information related to your questions? Is that clear?
A. Are you asking me like if I asked her if there was anything else?
Q. Yes.
A. Yes, I did.
Q. Okay. And did you ask her that at the end of the interview?
A. Yes. When we ask that, it's typically towards the end.
Q. Okay. And did she respond that she had any further information to give you other than what she had already given you?
A. She said she did not have any more information.
Q. Now, during the course of your interview with her and you asking her details, the details included asking where she was alleged that-where she was allegedly that she was touched, correct?
A. That is correct.
Q. Okay. And in that-at that time, she never alleged being touched on her boobs, correct?
A. That is correct.
....
Q. Okay. During your interview with [Tiffany], did she-she never mentioned during your interview with her that she ever had to shave Mr. Prince, the suspect's middle part, correct?
A. That is correct.
Q. So that's-if something like that was mentioned, that would be new information that you've never heard?
A. That is correct.
Gonzalez testified, in response to defense counsel's questions, that Tiffany disclosed that the first instance of abuse occurred when she was ten and in the fourth grade. She also disclosed that the last incident occurred before her thirteenth birthday in December 2014.
Defense counsel also questioned Gonzalez about whether, in her experience, she had interviewed a child who was not being truthful and whether Gonzalez knew at the time of the interview that the child was not being truthful or if she found out later. Gonzalez responded that she had "done both kind of cases." Defense counsel asked if there are "specific indicators" that lead her to learn that a child was not truthful, and Gonzalez testified:
So in a forensic interview, we kind of test for consistency and how much they're able to give me details, unsolicited details, especially spontaneous details. Those are things that tell me whether the child is credible or not. So we look for those in a forensic interview.... Where a child possibly wasn't consistent or not able-because when we open it up and allow them to tell us details, when we go back and they're not able to tell me full details, that's where some of the red flags come in and where I'm able to kind of look back and see some of those red flags.
Gonzalez clarified that she does not re-interview children in a later interview, but instead she lets the child tell what happened "from the very beginning to the very end," and then she questions the child and "fill[s] in the holes of details that were missing in that one interview."
Defense counsel then asked another series of questions concerning where Tiffany disclosed that she had been touched:
*569 Q. Now, during one point of your interview-and you can refer to your notes if you need-there was an instance when you were asking [Tiffany] about what area she was touched in, correct?
A. That is correct.
Q. And you went by-you went through various areas of the body asking her if she was touched on her boobs, correct? And then you asked if she was touched on any other parts of her body, correct?
A. That is correct.
Q. And at some point, you asked her if she'd ever been touched on her butt, correct?
A. That's correct.
Q. And she answered your question and then you followed up to-after hearing her response, you followed up to allege that she had said that there was a time where the middle part tried to go in her butt, correct?
A. That is what she stated.
Q. Okay. But then you followed that up to, as you say, go back to follow up the details-
A. Uh-huh, right.
Q. -and then you asked her, Am I correct that you're saying that the middle part went in your butt.
A. I see what part you're talking about.
Q. And then so when you went back to fill in the details and you asked her again about the middle part going in your butt, she then said, No, that's not what I said. Is that correct?
A. That's correct.
Q. So where-where was the confusion that that's what you gathered from her answers that that's what she said?
A. Okay. So if you see around a minute 20:05 when we do the sexual abuse inquiry, she tells me the parts of the body and she mentioned the butt, and I had asked her if anybody had ever touched her butt, she said, Him, he tried to put his middle part in my butt two times. And then I asked-
Q. Okay. So you asked her had he put his middle part in her butt; that's what you asked?
A. No, no. I asked her, Has anyone ever touched you on your butt.
Q. Okay. And would you deem that to be a leading question?
A. No. That's a yes-or-no question.
Q. Okay. Wouldn't-okay. So the next question is when you follow up to clarify whether or not she meant that the middle part went in her butt, correct, his middle part went in her butt?
A. Right. She took me on a different angle of types of contact, but I had to go back to make sure that I heard it right.
Q. Okay. And when you went back, she said that's not what she said, correct?
A. Right.
Q. Which is just a few minutes later?
A. Uh-huh, yeah, about a minute later.
Q. Even though from how you're reading, she specifically said that it occurred twice?
A. That is correct.
Q. Okay. So did that appear to be, as you stated-phrased early, a red flag within a couple of minutes?
A. That could be a red flag, yes, ma'am.
Defense counsel also asked whether Gonzalez learned during the forensic interview that appellant had allegedly tried to perform *570 oral sex on Tiffany and that he forced her to touch his penis with her fingers. Gonzalez confirmed that Tiffany disclosed both of these acts during the interview. Defense counsel further asked whether Tiffany mentioned that she disclosed the abuse to Rebecca "the first time anything happened," and Gonzalez responded in the affirmative. Gonzalez also testified that Tiffany was unable to state with precision how many times abuse occurred.
After the cross-examination of Gonzalez, the State moved to admit the video recording of the forensic interview under the rule of optional completeness. The prosecutor stated, "The defense has asked many specific questions regarding the contents of this interview leaving a false impression with the jury and we are offering it to offer the full context of the interview under optional completeness."
Appellant's attorneys made the following arguments for why the recording should not be admitted:
[Co-counsel]: We would say that the interview is inadmissible hearsay in and of itself to admit the entire interview. Furthermore, the State has had the opportunity and has called the witness to testify as to what she disclosed and that was testified to, and the witness has testified to her-her story of the event. So there is not a necessity to admit into evidence the entire interview.
[Counsel]: In addition, Judge, we did not present a false image to the jury. In fact, what we did was show inconsistencies between what [Tiffany] testified to and what is in the report. So there is not-we only asked questions based upon what [Tiffany] testified to. We are not giving a false image to the jury by any means.
[Co-counsel]: Furthermore, all of our questions were asked of the witness [Gonzalez] of exactly what she observed in her interview and what occurred in her interview. And she verified all of the things with her notes from her interview. So we did not in any way make any false impressions of the interview itself.
The trial court overruled defense counsel's objections and admitted the video recording of the forensic interview, which was then played for the jury.
Appellant called several family members, including his ex-wife and two of his daughters, to testify on his behalf. Each of them testified that they had observed appellant and Tiffany interact and that they appeared to have a close and appropriate relationship. One of appellant's daughters testified that Tiffany and Lauren attended the funeral of Lauren's mother-appellant's sister-in December 2015, after the police had been notified about the allegations against appellant, and they both hugged appellant at the funeral and comforted each other. Appellant's daughters testified that appellant had never behaved inappropriately with either of them, and they had never seen him behave inappropriately with anyone else.
The jury found appellant guilty of the offense of continuous sexual abuse of a child and assessed his punishment at twenty-five years' confinement, the statutory minimum sentence. This appeal followed.
Admission of Forensic Interview
In his sole issue, appellant contends that the trial court erred by admitting the video recording of the complainant's forensic interview under the rule of optional completeness. Appellant argues that the forensic interview constituted inadmissible hearsay and that it was not necessary to admit the recording to clear up a false impression.
*571 A. Standard of Review and Governing Law
We review a trial court's decision to admit or exclude evidence for an abuse of discretion. Henley v. State , 493 S.W.3d 77, 82-83 (Tex. Crim. App. 2016). A trial court abuses its discretion when its ruling "was so clearly wrong as to lie outside the zone within which reasonable people might disagree." Id. at 83 (quoting Taylor v. State , 268 S.W.3d 571, 579 (Tex. Crim. App. 2008) ).
Hearsay is an out-of-court statement offered to prove the truth of the matter asserted in the statement. TEX. R. EVID . 801(d). Generally, hearsay is not admissible unless a statute or rule provides otherwise. TEX. R. EVID . 802.
One such exception to the general rule that hearsay is not admissible is found in Code of Criminal Procedure article 38.072, which provides that in certain sexual offenses involving children under the age of fourteen, the first statement by the child to a person eighteen years of age or older other than the defendant that describes the alleged offense is not inadmissible hearsay if other statutory requirements are met. TEX. CODE CRIM. PROC. ANN. art. 38.072, § 2(a) - (b) (setting out requirements, including that trial court must find that statement is "reliable based on the time, content, and circumstances of the statement"); see Martinez v. State , 178 S.W.3d 806, 811 (Tex. Crim. App. 2005) (" Article 38.072 is a rule of evidence admissibility, allowing trial courts to admit some hearsay statements in the prosecution of certain offenses against children when those statements are made under the specified conditions."). Ordinarily, however, article 38.072 "does not permit admission of video-recorded statements of a complainant." Bays v. State , 396 S.W.3d 580, 592 (Tex. Crim. App. 2013). Code of Criminal Procedure article 38.071 allows for the admission of a recording of an oral statement of a child in limited circumstances, but this provision only applies when the child is unavailable to testify. TEX. CODE CRIM. PROC. ANN . art. 38.071, § 1 - 2 ; Smith v. State , 459 S.W.3d 707, 712-13 (Tex. App.-Texarkana 2015, pet. ref'd). In this case, Tiffany was available to, and did, testify.
Texas Rule of Evidence 107, the rule of optional completeness, is also an exception to the general rule that hearsay is inadmissible. Pena v. State , 353 S.W.3d 797, 814 (Tex. Crim. App. 2011) ; Walters v. State , 247 S.W.3d 204, 217 (Tex. Crim. App. 2007). The rule of optional completeness provides:
If a party introduces part of an act, declaration, conversation, writing, or recorded statement, an adverse party may inquire into any other part on the same subject. An adverse party may also introduce any other act, declaration, conversation, writing, or recorded statement that is necessary to explain or allow the trier of fact to fully understand the part offered by the opponent. "Writing or recorded statement" includes a deposition.
TEX. R. EVID . 107. This rule "is one of admissibility and permits the introduction of otherwise inadmissible evidence when that evidence is necessary to fully and fairly explain a matter 'opened up' by the adverse party." Walters , 247 S.W.3d at 217-18. The rule "is designed to reduce the possibility of the jury receiving a false impression from hearing only a part of some act, conversation, or writing." Id. at 218.
Admission of evidence under the rule of optional completeness is "not invoked by the mere reference to a document, statement, or act." Pena , 353 S.W.3d at 814 ; Walters , 247 S.W.3d at 218. Rather, for evidence to be admissible under this *572 rule, "the omitted portion of the statement must be 'on the same subject' and must be 'necessary to make it fully understood.' " Pena , 353 S.W.3d at 814 (quoting Sauceda v. State , 129 S.W.3d 116, 123 (Tex. Crim. App. 2004) ); see Walters , 247 S.W.3d at 218 (" Rule 107 does not permit the introduction of other similar, but inadmissible, evidence unless it is necessary to explain properly admitted evidence.").
When defense counsel pursues a subject or line of questioning that would ordinarily be outside of the realm of proper comment for the State, the defense "opens the door" and creates a right of reply for the State. Tovar v. State , 221 S.W.3d 185, 190 (Tex. App.-Houston [1st Dist.] 2006, no pet.). "A party who opens a door to an issue 'cannot complain when the opposing party desires to go into the details of that subject.' " Id. (quoting Sherman v. State , 20 S.W.3d 96, 101 (Tex. App.-Texarkana 2000, no pet.) ). In a case involving whether a video recording of a child-complainant's forensic interview was admissible under the rule of optional completeness, this Court held that the State is entitled to the admission of such a video recording when (1) defense counsel asks questions concerning some of the complainant's statements on the recording, (2) defense counsel's questions leave the possibility of the jury's receiving a false impression from hearing only part of the conversation, with statements taken out of context, and (3) the recording is necessary for the conversation to be fully understood. Id. at 190-91. Even when defense counsel's questions relate to the complainant's statements on the recording, the rule of optional completeness does not permit the State to introduce the recording when (1) the recording is unnecessary to show the context of the statement, such as showing the absence of a statement by the complainant rather than the existence of a directly contradictory statement, and (2) admission of the recording would likely create confusion, such as when the recording references extraneous offenses. Id. at 191 (citing Sauceda , 129 S.W.3d at 121-24 ).
B. Analysis
In this case, defense counsel cross-examined Tiffany about her forensic interview with Gonzalez. Defense counsel asked Tiffany if she told Gonzalez "everything that occurred" and whether she left "anything out," and Tiffany responded that she did tell Gonzalez everything that had occurred and she did not leave anything out. Tiffany disagreed with defense counsel that she told Gonzalez that there were "four and five incidents." She then agreed with defense counsel that she told Gonzalez that no one ever touched her breasts, but that she testified in court that appellant touched her breasts. Tiffany also disagreed with defense counsel that she told Gonzalez that she had disclosed the abuse to her cousin Rebecca on the first incident that the abuse occurred.
Gonzalez testified on direct examination concerning the general forensic interview process, including the questioning techniques that are used and the techniques that are avoided, which includes using leading questions. She also testified that she conducted Tiffany's forensic interview and that Tiffany disclosed sexual abuse by a single perpetrator, "provid[ing] several kinds of sensory details" about the abuse. Gonzalez testified that she had no concerns about the interview. She did not, on direct examination, provide any details about what Tiffany told her during the interview, and the State did not, at this point, offer into evidence the video recording of the interview.
Defense counsel also cross-examined Gonzalez about portions of her interview *573 with Tiffany. Gonzalez agreed that she asked Tiffany where on her body she had been touched and, at the end of the interview, she asked Tiffany if she had any further information to provide. Gonzalez agreed with counsel that, during the interview, Tiffany never mentioned that appellant touched her on her breasts and she never mentioned that appellant made her shave his penis. She testified that Tiffany disclosed that the first incident of abuse occurred when she was ten and in fourth grade and that the last incident occurred around her thirteenth birthday in December 2014. Gonzalez also testified that Tiffany disclosed that appellant had performed oral sex on her and that he forced her to touch his penis with her hand. She further testified that Tiffany stated that she told her cousin Rebecca about the abuse the first time it happened. She stated that Tiffany could not provide an estimate of how many times abuse occurred.
Defense counsel asked Gonzalez whether she had had, in the past, cases in which she learned, either during the interview or afterwards, that the child was not being truthful with her, and counsel asked about "specific indicators" regarding a child's truthfulness. Gonzalez testified that she looks for consistency in a child's responses and whether a child can provide unsolicited, spontaneous details. Defense counsel then questioned Gonzalez about the parts of the body where Tiffany disclosed that she had been touched, specifically about whether Gonzalez asked Tiffany "if she'd ever been touched on her butt." During this discussion, Gonzalez testified that Tiffany stated that appellant "tried to put his middle part in [her] butt" and that this happened on two occasions. Gonzalez stated that she asked Tiffany several follow-up questions and then, about a minute later, Tiffany told Gonzalez that that was not what she had said. Gonzalez agreed with defense counsel that this exchange "could be a red flag." During Tiffany's trial testimony, she had not mentioned any attempted anal penetration.
After defense counsel finished cross-examining Gonzalez, the State offered the recording of Tiffany's entire forensic interview with Gonzalez, arguing that because defense counsel asked specific questions regarding the contents of the forensic interview that left a false impression with the jury, the recording was admissible under the rule of optional completeness. Defense counsel argued that the recording of the interview constituted inadmissible hearsay and that the questioning of Tiffany and Gonzalez did not create a false impression because the questioning showed inconsistencies between the forensic interview and Tiffany's trial testimony and counsel asked Gonzalez "exactly what she observed in her interview and what occurred in her interview" and Gonzalez "verified all of the things with her notes from her interview." The trial court overruled defense counsel's objection and admitted the video recording of the forensic interview. The recording was then published to the jury.
Assuming, without deciding, that the trial court erred in admitting the entire recording of Tiffany's forensic interview under the rule of optional completeness, we must determine whether the error requires reversal of the trial court's judgment of conviction. See TEX. R. APP . P. 44.2. Because the erroneous admission of hearsay evidence is not constitutional error, we apply the standard set out in Rule 44.2(b) and disregard the error if it did not affect the defendant's substantial rights. See TEX. R. APP . P. 44.2(b) ; Campos v. State , 317 S.W.3d 768, 779 (Tex. App.-Houston [1st Dist.] 2010, pet. ref'd) ("The erroneous admission of a hearsay statement constitutes non-constitutional error *574 that is subject to a harm analysis."). A defendant's substantial rights are affected when the error had a substantial and injurious effect in determining the verdict. Campos , 317 S.W.3d at 779 (citing Johnson v. State , 43 S.W.3d 1, 4 (Tex. Crim. App. 2001) ). We should not overturn a conviction for such an error if, after examining the record as a whole, we have fair assurance that the error did not influence the jury or had but a slight effect. Id. ; see also Motilla v. State , 78 S.W.3d 352, 355-56 (Tex. Crim. App. 2002) (stating that, in conducting harm analysis under Rule 44.2(b), appellate courts should consider testimony, any physical evidence admitted, nature of evidence supporting verdict, character of alleged error and how it might be considered in connection with other evidence, jury instructions, parties' theories of case, closing arguments, voir dire, if applicable, and whether State emphasized error).
The erroneous admission of evidence becomes harmless error if other evidence proving the same fact is properly admitted elsewhere, or the evidence comes in elsewhere without objection. Land v. State , 291 S.W.3d 23, 28 (Tex. App.-Texarkana 2009, pet. ref'd) ; see Brooks v. State , 990 S.W.2d 278, 287 (Tex. Crim. App. 1999) ("[A]ny error in admitting the [hearsay] evidence was harmless in light of other properly admitted evidence proving the same fact."); Matz v. State , 21 S.W.3d 911, 912 (Tex. App.-Fort Worth 2000, pet. ref'd) ("It is well-established that the improper admission of evidence does not constitute reversible error if the same facts are proved by other properly admitted evidence."). "In situations where a video recording is improperly admitted, yet the recording is cumulative of the victim's properly admitted live testimony on the same issue, courts often disregard the error, reasoning that it could not have affected the appellant's substantial rights." Land , 291 S.W.3d at 29 ; Mick v. State , 256 S.W.3d 828, 832 (Tex. App.-Texarkana 2008, no pet.) (holding that because video recording of interview of child complainant was cumulative of child's properly admitted trial testimony and discussed same subject, any error in admission of video recording did not affect defendant's substantial rights and was harmless); Matz , 21 S.W.3d at 912-13 (holding same).
As appellant acknowledges on appeal, the twenty-eight minute recording of Tiffany's forensic interview was mostly cumulative of her properly admitted trial testimony. In the interview, Tiffany described her agreement with appellant to clean his house, the gifts he would buy for her, the first incident of abuse when he touched her vagina, her attempts to make excuses not to go over to his house, the incident when appellant bought her a scooter and later attempted vaginal intercourse and performed oral sex on her, the incident when appellant forced her to touch his penis, her disclosure of the abuse to her cousin Rebecca, and the meeting with Rebecca's family and her family in which Lauren became aware of the abuse. Tiffany testified, without objection, to all of these events at trial. In addition, the trial court admitted, upon introduction by defense counsel, Tiffany's records from her medical examination at the Children's Assessment Center. These records included Tiffany's statements to Dr. Bachim that appellant touched her vagina with his finger and with his penis, that he had done this since she was around ten years old and the abuse continued until around her thirteenth birthday, and that appellant made her touch his penis with her hand. Dr. Bachim also testified that, during the medical exam, Tiffany identified appellant as the person who sexually abused her.
*575 The State also presented testimony from Tiffany's cousin, Quincy, corroborating Tiffany's testimony that, on one occasion, appellant unlocked Tiffany's bedroom door at her house, searched through his bags at the foot of Tiffany's bed, lifted up the bedcovers, and touched Tiffany on her vagina. Although Quincy did not see the actual touching, she woke up when appellant walked into the room, and she looked under the covers after appellant left and saw Tiffany's clothing in disarray, with her tights pulled down and her underwear visible, when her clothing had been in order when the girls had gone to sleep. Tiffany's mother, Lauren, testified that Tiffany started spending more and more time alone in her room after she would return home from cleaning at appellant's house, that appellant paid for a lock for Tiffany's bedroom door and then kept one of the keys, that Tiffany started making excuses for why she did not want to go over to appellant's house, and that appellant put a block on the phone that he had purchased for Tiffany so that the phone could only receive calls from his number.
In arguing that the trial court committed reversible error when it admitted the video recording, appellant points out that Tiffany "cried most of the time" during the interview and that the video "painted a very sympathetic image of a scared and crying young girl" that would have had a profound impact on the jury. A review of the video recording reflects that Tiffany did cry at several points throughout the interview, grabbing several tissues, and wiping tears away while she spoke. Although Tiffany was clearly emotional during the interview, she was able to narrate what had happened without needing to take any breaks and her crying did not impede her ability to speak with Gonzalez or to be understood.
As appellant points out, the State did refer to the video recording during closing argument. Early in the argument, the prosecutor stated, "You heard from [Tiffany] herself, not only in her testimony, but also in that forensic interview video that you saw back when it happened, back when it was still so terribly fresh in her mind...." After defense counsel made her closing arguments, in which counsel repeatedly discussed Gonzalez's testimony and the forensic interview, the prosecutor spoke of the "subtle hints" and "subtle cries for help" that Tiffany made, such as making up excuses not to go to appellant's house, stating, "You heard her say that to the forensic interviewer, you heard her say that on the stand." Shortly thereafter, the prosecutor stated, "She was broken, had made cries for help and nobody heard her. But you-all did. You heard her on the stand, you heard her in her forensic statement, you heard all the other consistent statements that she made."
Appellant also argues that harm was established because while the jury was deliberating, "the jury sent out two notes indicating it was having a hard time coming to a decision on guilt, but then came to a fairly quick decision after it requested to view the complainant's forensic interview again." The record reflects that the jury began deliberating around 11:00 a.m. on Wednesday and ultimately reached a verdict around noon on Thursday. During this time, the jury sent out four notes, none of which were timestamped, although the first two indicated they were filed with clerk on February 21 (Wednesday) and the latter two were filed with the clerk on February 22 (Thursday). The first note read, "Can't reach a verdict." The second note read, "Is it possible for us to get a break?" The third note-and the first note dated February 22-read, "Can we view the interview video again. We have a conflict on the complainant's response to the *576 interviewer's questions." Nothing in the record indicates which responses were causing a conflict among the jury, and nothing in the record indicates when on February 22 the jury sent out this note, when they watched the interview again, and how much time elapsed before they reached a verdict. The fourth note read, "We are at conflict with the time frame/span between when the HPD report was made & when the forensic interview was completed by the interviewer. Please clarify the dates." Although the record reflects that the jury did, as appellant argues, ask to view the forensic interview again during deliberations, nothing in the record supports appellant's contention the jury came to a "fairly quick decision" on guilt after it viewed the interview.
When we consider the entire record, as we must when conducting a harm analysis under Rule 44.2(b), we conclude that a fair assurance exists that any error in admitting the video recording of Tiffany's forensic interview did not influence the jury or had but a slight effect. See TEX. R. APP . P. 44.2(b) ; Campos , 317 S.W.3d at 779 ; Mick , 256 S.W.3d at 832 ; Matz , 21 S.W.3d at 912-13. We hold that any error by the trial court in admitting the forensic interview did not constitute reversible error.
We overrule appellant's sole issue.
Conclusion
We affirm the judgment of the trial court.

See Tex. Penal Code Ann . § 21.02(b).

In this opinion, we use pseudonyms to protect the identities of the minor complainant, the complainant's minor relatives, and the complainant's mother.

Lauren testified that, when she discovered appellant had put a block on Tiffany's phone, she confronted him about this. Appellant told Lauren that he had the block placed on the phone because Tiffany missed two occasions of cleaning at his house, which made him angry. Lauren testified that Tiffany missed these two occasions because Tiffany had asked if she could go to her cousin's house instead.

Tiffany did not state precisely when this incident occurred. She testified that appellant began touching her inappropriately when she was in the third grade-around nine or ten years old-and that this lasted until when she was in the seventh grade-when she was twelve or thirteen.

Tiffany did not remember how old she was when she told Rebecca about the abuse, but she estimated that they were both in sixth grade when she made this disclosure.

On direct examination, Tiffany had referenced staying the weekend at appellant's house with her brother and her cousin on one occasion, but she did not, at that point in her testimony, state that anything inappropriate had happened on that occasion.