**Opinion issued April 9, 2024**



**In The**

# Court of Appeals

**For The**

# First District of Texas

_____

**NO. 01-22-00893-CR**
_____

**SERGIO ALVARADO, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 351st District Court**
**Harris County, Texas**
**Trial Court Case No. 1679186**

**MEMORANDUM OPINION**

A jury convicted appellant, Sergio Alvarado, of the second-degree felony offense of indecency with a child by contact.[1] After Alvarado and the State reached

---

[1] *See* TEX. PENAL CODE § 21.11(a)(1), (c)(1).

an agreement on sentencing, the trial court assessed Alvarado's punishment at four years' confinement.

In three issues, Alvarado argues that (1) the trial court abused its discretion in denying his motion for a directed verdict; (2) the State failed to present sufficient evidence that Alvarado touched the complainant with the intent to arouse or gratify the sexual desire of any person; and (3) the trial court erred by failing to admit the complainant's forensic interview under the rule of optional completeness to clarify a false impression. We affirm.

**Background**

A.S. ("Alexis") has three daughters, including the complainant A.C. ("Adele").[2] Adele's father passed away in 2015, when she was three years old, but Adele remained close with her father's side of the family. One of her father's sisters, Elizabeth, is married to Alvarado. Alvarado and Elizabeth have four children, including two daughters who are a few years older than Adele.

Of her father's family, Adele was particularly close to Anjelica, her paternal grandmother. Anjelica used to babysit Adele and her younger sister while Alexis worked, and the girls would frequently spend the night at Anjelica's house. Elizabeth, Alvarado, and their children lived next door to Anjelica. Adele and her

---

[2]    In this opinion, we use pseudonyms for the complainant and her mother to protect their privacy.

sister often went to Elizabeth's house so they could play with their cousins. Adele was "very close" with Elizabeth, and it was common for Adele and her sister to spend the night at Elizabeth's house. Alexis did not always know when Adele was at Elizabeth's house, as opposed to Anjelica's house, but she trusted Elizabeth and she had no concerns with this arrangement.

As a young child, Adele had been "happy [and] very friendly," frequently smiling and "goofing around." In 2019, however, when Adele was seven years old, Alexis began noticing changes in Adele's behavior. Adele would have "angry outbursts" in which she would slam doors and say things like, "I hate this family." Adele became quieter and more reserved, and she played less with her friends. Adele also stopped wanting to go to Elizabeth's house, preferring instead to stay with Anjelica. Alexis thought it was odd that Adele did not want to spend time at Elizabeth's house, but she believed that perhaps Adele just wanted to spend more time with Anjelica and was more comfortable sleeping at Anjelica's house.

In January 2020, when Adele was eight years old, Alexis took Adele to the doctor because of a possible urinary tract infection. At the beginning of the appointment, Adele was quiet and "just to herself." When the female doctor started to remove Adele's pants for the examination, Adele "started crying and screaming that she didn't want [the doctor] to do that." Alexis was shocked by Adele's behavior because this was not how she normally reacted when someone touched her.

In the car on the way home, Alexis questioned Adele about her reaction in the doctor's office. Adele told Alexis not to tell Elizabeth. After Alexis reassured Adele, Adele disclosed that Alvarado had touched her "down there" and pointed to her vagina. When asked if Adele told her where this had happened, Alexis testified:

> Yes, she [Adele] said at [Elizabeth's] house. That she was staying the night. Her two cousins were in their room sleeping, and she was sleeping on the couch. She said it was nighttime and that the way their house is . . . their couch is right here and across the room is their [Alvarado and Elizabeth's] bedroom. The bedroom is usually open. They have like a wide door.
>
> So what she told me was [Alvarado] sat down next to her and started touching her private part down there, and that's when she told him to stop, to please stop and he didn't. Finally, he did; and he went across the room changed his shirt and sprayed cologne. She told me cologne.

Adele reported to Alexis that she was "about six, seven" when this occurred.

While Alexis and Adele were still in the car, Alexis called Elizabeth and told her about Adele's disclosure. Elizabeth was "in disbelief" over the allegation. Alexis dropped Adele off at their house and then drove to pick up Elizabeth. Elizabeth was standing outside, and she appeared "really shocked and worried and already saying, No. Like, no, no." Back at Alexis's house, Adele told Elizabeth what had happened. In response, Elizabeth told Adele that "it was just a dream and it's not true and that [Alvarado] wouldn't do that." Alexis was upset that Elizabeth did not believe Adele, and she took Elizabeth home.

4

Alexis then told other members of the family, including Anjelica and Adele's other aunts.[3] Although some family members believed Adele's disclosure, Elizabeth and Anjelica did not. Adele no longer communicates with Anjelica, Elizabeth, Elizabeth's children, and Alvarado. Adele's "angry outbursts" stopped after her disclosure.

Alexis called the police and reported Adele's disclosure. Baytown Police Department Detective Adrian Soto testified about the investigation that he conducted in response to the report. On cross-examination, Soto agreed that he learned during his investigation that an older cousin of Adele's had shown her "some pornographic images or videos."[4]

As part of the investigation, Adele underwent a physical examination and a forensic interview at the Harris County Children's Assessment Center ("CAC"). The trial court admitted the medical records from Adele's physical exam. Sharon Record, the nurse who performed the exam, also testified. Both Record's testimony and the

---

[3] Alexis also let her older sister, Nicole, know about Adele's disclosure. After Nicole finished work for the day, she came over to Alexis's house and spoke with Adele alone. Nicole testified about Adele's demeanor during this conversation, but she did not testify about what Adele had told her.

[4] Adele testified that when she was eight or nine years old, one of her older cousins showed her "naked people" on a phone. Adele did not say anything to her cousin about it, but she remembered being bothered by it and thinking, "Why are you showing me this? I'm not supposed to be seeing this." Adele agreed with defense counsel that this occurred shortly before she disclosed to Alexis that Alvarado had touched her.

5

medical records discussed Adele's statements concerning the allegations against Alvarado.

The individual who conducted Adele's forensic interview was not available to testify at trial. Claudia Hauser, the supervisor of Forensic Services at the CAC, reviewed the video recording of Adele's interview. Prior to Hauser's testimony, defense counsel argued that the recording of the entire forensic interview should be admitted under the rule of optional completeness. The State argued that the recording was inadmissible hearsay. After several discussions concerning the admissibility of the forensic interview, and after Hauser's direct examination, the trial court ultimately ruled that the recording was inadmissible hearsay.

In addition to testifying about the general forensic interview process, Hauser testified about several stages of disclosure of abuse, including tentative disclosure and active disclosure. With respect to Adele specifically, Hauser testified that Adele's demeanor during the interview was "avoidant, reserved, hesitant." She "struggled" with providing sensory details, and it "was really difficult to get those details from her." Hauser believed Adele appeared to be in the tentative disclosure stage. Hauser further testified that Adele "present[ed] very avoidant which is common for a tentative disclosure," but as the interview continued, she "move[d] into active disclosure where she disclose[d] more details about the offense."

Defense counsel cross-examined Hauser about Adele's stage of disclosure. Hauser testified that Adele "presented in the [t]entative stage or phase where it's very ambivalent," and she would provide some information but also say things like, "I don't know. I'm not sure." It did not take very long, however, for Adele to transition into "[a]ctive disclosure" and there "was more information that was being elicited by the child." During the beginning of the interview, Adele generally answered questions with "one or two word statements," but she "did loosen up more towards the end" of the interview. Hauser agreed that the topic of pornography was raised during the forensic interview. She also agreed that when pornography was discussed, Adele "volunteered information."

Adele also testified. She was ten years old at the time of trial. She testified that she frequently spent time at Alvarado and Elizabeth's house, playing with her cousins and spending the night. When spending the night, Adele would sometimes sleep in her cousins' bedroom, but she usually slept on the couch in the living room. On the day of the incident, which occurred when she was six or seven years old, Adele spent the day playing with her cousins. That night, she went to sleep on the couch in the living room. Adele was wearing shorts, and she laid on the couch with her head on the arm rest. No one else was in the living room with her.

During the night, Adele woke up and saw Alvarado sitting on the couch next to her legs. She was confused about why he was there instead of sleeping. Alvarado

reached up the legs of her shorts and touched Adele's vagina underneath her underwear with his hand. Adele could not remember how long this lasted, but she asked him to stop twice. After the second time, he finally stopped. Alvarado said something to her, but Adele did not know what he said or whether he spoke to her in English or in Spanish. After Adele told him to stop, Alvarado walked into his bedroom and sprayed cologne. Adele went to the bathroom and then into her cousins' bedroom.

Adele did not immediately tell anyone about this incident because she thought no one would believe her, especially Elizabeth. Adele testified that when she later went to a doctor's appointment, she did not wish to take her clothes off for the examination and she started screaming and yelling. When asked why she reacted in that manner, Adele stated: "Because I didn't know, like, if [the doctor] like saw something, like, not saw something, if she was going to eventually know what happened. I didn't want anybody to know, and then I was like scared that I didn't want her to like, you know, do that. I didn't want her to check right there." During the drive home from the doctor's office, Adele told Alexis what had happened. Adele also told Elizabeth, but Elizabeth did not believe her and told Adele that it "didn't happen" and that "it was a dream."

After the State rested, Alvarado moved for a directed verdict, arguing that the State had presented no evidence that Alvarado touched Adele with the intent to arouse or gratify sexual desire. The trial court denied the motion.

The jury found Alvarado guilty of the offense of indecency with a child by contact. At the beginning of the punishment phase before the trial court, the parties announced that they had reached an agreement concerning punishment. The court accepted the agreement and assessed Alvarado's punishment at four years' confinement. This appeal followed.

## Sufficiency of the Evidence

In his first issue, Alvarado argues that the trial court erred by failing to grant his motion for directed verdict. In his second issue, he argues that the State failed to present sufficient evidence that he touched Adele with the intent to arouse or gratify his sexual desire. We address these issues together.

### A.     *Standard of Review*

We treat an appellate issue complaining about the denial of a motion for directed verdict as a challenge to the sufficiency of the evidence. *Orellana v. State*, 381 S.W.3d 645, 652 (Tex. App.—San Antonio 2012, pet. ref'd); *see Smith v. State*, 499 S.W.3d 1, 6 (Tex. Crim. App. 2016) ("A motion for instructed verdict is essentially a trial level challenge to the sufficiency of the evidence.").

9

When determining whether sufficient evidence supports a conviction, we consider the evidence in the light most favorable to the verdict and determine whether, based on the evidence and reasonable inferences from the evidence, a rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Edwards v. State*, 666 S.W.3d 571, 574 (Tex. Crim. App. 2023). The factfinder bears the responsibility to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *Edwards*, 666 S.W.3d at 574 (quoting *Jackson*, 443 U.S. at 319); *Dunham v. State*, 666 S.W.3d 477, 482 (Tex. Crim. App. 2023) (stating that factfinder is sole judge of "the credibility and weight to be attached to the testimony of witnesses") (quotations omitted).

We may not substitute our judgment for that of the factfinder by reevaluating the weight and credibility of the evidence. *Edwards*, 666 S.W.3d at 574. When the record supports conflicting inferences from the evidence, we presume that the jury resolved the conflicts in favor of the verdict, and we defer to that determination. *Dunham*, 666 S.W.3d at 482 (quotations omitted).

In our review, we consider "the cumulative force of the evidence." *Edwards*, 666 S.W.3d at 574; *see Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015) (stating that we may not use "divide and conquer" strategy when evaluating sufficiency of evidence) (quotations omitted). "Each fact need not point directly and

independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Circumstantial evidence is as probative as direct evidence, and circumstantial evidence alone may be sufficient to establish guilt. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013).

**B.     *Intent to Arouse or Gratify the Defendant's Sexual Desire***

A defendant commits the offense of indecency with a child if, with a child younger than 17 years of age, the defendant engages in sexual contact with the child or causes the child to engage in sexual contact. TEX. PENAL CODE § 21.11(a)(1). Penal Code section 21.11(c) defines "sexual contact" to include "any touching by a person, including touching through clothing, of the anus, breast, or any part of the genitals of a child" if the act is committed "with the intent to arouse or gratify the sexual desire of any person." *Id.* § 21.11(c)(1). Under the indictment and the jury charge in this case, the State was required to prove that Alvarado touched Adele's sexual organ with the intent to arouse and gratify his sexual desire.

The offense includes the requirement that the touching occur with the intent to arouse or gratify the sexual desire of any person because "legitimate, non-criminal, contact may occur between parents, nurses, doctors, or other care-givers and a child, particularly a young child, on the relevant body parts." *Caballero v.*

11

*State*, 927 S.W.2d 128, 130 (Tex. App.—El Paso 1996, pet. ref'd). However, the offense does not require "that the arousal or gratification actually occur." *Id.* Instead, "[t]he offense of indecency with a child is complete upon the contact accompanied by the requisite intent." *Id.* at 130–31. Indecency with a child "requires proof of the accused's intent to engage in the proscribed contact, rather than intent to bring about a particular result." *Scott v. State*, 202 S.W.3d 405, 407 (Tex. App.—Texarkana 2006, pet. ref'd); *Caballero*, 927 S.W.2d at 131.

The requisite intent may be inferred from the defendant's conduct, his remarks, and the surrounding circumstances. *McKenzie v. State*, 617 S.W.2d 211, 216 (Tex. Crim. App. 1981); *Stephenson v. State*, 673 S.W.3d 370, 384 (Tex. App.—Fort Worth 2023, pet. ref'd); *Gonzalez v. State*, 522 S.W.3d 48, 57 (Tex. App.—Houston [1st Dist.] 2017, no pet.). "No oral expression of intent or visible evidence of sexual arousal is necessary." *Scott*, 202 S.W.3d at 408; *Gregory v. State*, 56 S.W.3d 164, 171 (Tex. App.—Houston [14th Dist.] 2001, pet. dism'd).

On appeal, Alvarado argues that the State failed to present sufficient evidence that he touched Adele with the intent to arouse or gratify his sexual desire. Alvarado acknowledges that visible evidence of arousal is not required for the evidence to be sufficient, but he argues that if any contact occurred in this case, it "lasted mere seconds," which is "not enough to gratify any sexual desire." He further argues that

12

nothing in Adele's testimony or her statements about the incident to other people "indicated that [the touching] was sexual in nature." We disagree.

Adele testified that the incident occurred when she was six or seven years old and she was spending the night at Alvarado and Elizabeth's house after playing with her cousins. Adele was sleeping alone on the couch in the living room when she woke up during the night and saw Alvarado sitting on the couch next to her legs. While mumbling something that she could not understand, Alvarado reached up through the leg of her shorts and underneath her underwear. He touched her on her vagina with his hand. She told Alvarado to stop twice before he did so. He then left the living room and went back to his bedroom.

The jury could have permissibly inferred the requisite intent from Alvarado's conduct and the surrounding circumstances. *See McKenzie*, 617 S.W.2d at 216. The touching occurred at night, when the rest of the household was asleep, and Adele was alone in the living room. Adele had been asleep before Alvarado touched her, and Alvarado does not argue that the touching occurred accidentally, such as during innocent play. *See Perales v. State*, 226 S.W.3d 531, 535 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (concluding that sufficient evidence supported requisite intent even when defendant told police that he had been playing with his daughter, "she started to fall, and he had caught her and held her vagina"). Additionally, Alvarado was not Adele's caregiver and thus had no medical or health reasons to touch Adele's

vagina, especially during the middle of the night while Adele slept. *See Scott*, 202 S.W.3d at 408–09 (rejecting defendant's argument that he lacked improper intent but instead touched stepdaughter's vagina to assist her with applying medical cream when stepdaughter was old enough to apply medication herself and defendant also touched her "unrelated to application of medication"); *Caballero*, 927 S.W.2d at 130 (noting that offense of indecency with child contains requirement that touching occur with intent to arouse or gratify sexual desire because "legitimate, non-criminal, contact may occur between parents, nurses, doctors, or other care-givers and a child, particularly a young child, on the relevant body parts").

Adele also testified that Alvarado reached up the leg of her shorts and underneath her underwear to touch her. This is also a surrounding circumstance that the jury could consider when determining whether Alvarado touched Adele with the intent to arouse or gratify his sexual desire. *See Scott*, 202 S.W.3d at 409 (stating that jury could have inferred requisite intent from child's testimony that defendant reached under her shirt to touch her breasts); *see also Gonzalez*, 522 S.W.3d at 57 (concluding that sufficient evidence existed to support conviction when child testified that defendant "pulled her underpants aside to put his mouth and tongue on her genitals"). Adele also told Alvarado to stop touching her. *See Perales*, 226 S.W.3d at 535 (considering fact that child told defendant to stop touching her).

14

The State was not required to prove that "the arousal or gratification actually occur[ed]" when Alvarado touched Adele. *See Caballero*, 927 S.W.2d at 130. Instead, "[t]he offense of indecency with a child is complete upon the contact accompanied by the requisite intent." *Id.* at 130–31. We conclude that a rational jury could infer from Alvarado's conduct and the surrounding circumstances that he touched Adele with the intent to arouse or gratify his sexual desire. *See McKenzie*, 617 S.W.2d at 216; *Gonzalez*, 522 S.W.3d at 57. Viewing the evidence in the light most favorable to the verdict, a rational jury could have found beyond a reasonable doubt that Alvarado touched Adele's vagina with the intent to arouse or gratify his sexual desire. *See* TEX. PENAL CODE § 21.11(a)(1), (c)(1). We hold that sufficient evidence supports Alvarado's conviction.

We overrule Alvarado's first and second issues.[5]

---

[5] On appeal, Alvarado cites two cases from our sister courts for the proposition that "other cases finding the evidence legally sufficient deal with facts far greater than those here." *See Breckenridge v. State*, 40 S.W.3d 118, 128 (Tex. App.—San Antonio 2000, pet. ref'd); *Hayden v. State*, 13 S.W.3d 69, 72–74 (Tex. App.—Texarkana 2000), *rev'd on other grounds*, 66 S.W.3d 269 (Tex. Crim. App. 2001). As this Court has previously stated, however, "Simply because cases exist in which more extreme conduct occurred—that is, in which intent to arouse or to gratify sexual desire could be more easily inferred—does not mean that a jury could not have inferred intent from the facts of this case." *See Perales v. State*, 226 S.W.3d 531, 535 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd).

## Rule of Optional Completeness

In his third issue, Alvarado argues that the trial court erred by failing to admit the video recording of Adele's forensic interview under the rule of optional completeness to clarify a false impression.

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Beham v. State*, 559 S.W.3d 474, 478 (Tex. Crim. App. 2018). The trial court abuses its discretion if it acts without reference to any guiding rules and principles or if it acts arbitrarily or unreasonably. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019).

Hearsay is an out of court statement offered to prove the truth of the matter asserted in the statement. TEX. R. EVID. 801(d); *Bahena v. State*, 634 S.W.3d 923, 927 (Tex. Crim. App. 2021). Generally, hearsay is inadmissible unless the statement falls within a recognized exception to the hearsay rule. TEX. R. EVID. 802; *Pena v. State*, 353 S.W.3d 797, 814 (Tex. Crim. App. 2011). Texas Rule of Evidence 107—the rule of optional completeness—is such an exception and provides:

> If a party introduces part of an act, declaration, conversation, writing, or recorded statement, an adverse party may inquire into any other part on the same subject. An adverse party may also introduce any other act, declaration, conversation, writing, or recorded statement that is necessary to explain or allow the trier of fact to fully understand the part offered by the opponent. "Writing or recorded statement" includes a deposition.

TEX. R. EVID. 107; *Pena*, 353 S.W.3d at 814; *Prince v. State*, 574 S.W.3d 561, 571 (Tex. App.—Houston [1st Dist.] 2019, pet. ref'd). The rule of optional completeness "is one of admissibility and permits the introduction of otherwise inadmissible evidence when that evidence is necessary to fully and fairly explain a matter 'opened up' by the adverse party." *Walters v. State*, 247 S.W.3d 204, 217–18 (Tex. Crim. App. 2007).

This rule is "designed to reduce the possibility of the jury receiving a false impression from hearing only a part of some act, conversation, or writing." *Pena*, 353 S.W.3d at 814 (quoting *Walters*, 247 S.W.3d at 218). To be admitted under this rule, the omitted portion of a statement must be on the same subject and must be necessary to make the statement fully understood. *Id.* (quoting *Sauceda v. State*, 129 S.W.3d 116, 123 (Tex. Crim. App. 2004)). The rule "does not permit the introduction of other similar, but inadmissible, evidence unless it is necessary to explain properly admitted evidence." *Walters*, 247 S.W.3d at 218; *see Castillo v. State*, 573 S.W.3d 869, 877–78 (Tex. App.—Houston [1st Dist.] 2019, pet. ref'd) (stating that if party questions witness about specific statements made by another during recorded interview, opposing party "may introduce any remaining part of the interview that concerns the same subject and is necessary to permit the jury to place those specific statements in their proper context").

17

Here, after Alexis called the police following Adele's disclosure that Alvarado had touched her, Adele underwent a forensic interview at the CAC in March 2020. By the time the case went to trial in November 2022, the individual who had conducted the forensic interview had moved and was no longer employed by the CAC. Claudia Hauser reviewed the video recording of Adele's forensic interview and formed some opinions about the interview.

Prior to Hauser's testimony, defense counsel requested that the trial court admit the recording of the entire forensic interview under the rule of optional completeness, arguing that if any part of the interview is discussed—including Adele's demeanor during the interview—it would be misleading not to show the entire interview. The State responded that it intended to ask Hauser general questions about forensic interviews, outcries, and disclosures, and then it intended to "connect[] those concepts to what [Hauser] reviewed on the actual forensic interview." The State did not intend to "elicit any hearsay from that video by any means," and it did not intend to play any portion of the interview. The State argued that merely asking general questions about forensic interviews, whether the interviewer followed proper protocols, and questions about Adele's demeanor "does not open the door to optional completeness." The State objected to introduction of the interview based on hearsay. The State also argued that it would call Adele as a

18

witness later in the trial, and defense counsel would have the ability to cross-examine her and "impeach her with pieces [of the interview] if he intends to do it that way."

Defense counsel responded that he intended to cross-examine Hauser about Adele's demeanor during the interview. Counsel stated:

> Specifically, the hesitation part at the beginning and then the confidence, volunteering information when they're talking about [Adele's cousin] and the pornography. It's one of those—if there is a saying that there's no change in demeanor, we can't separate that without getting into the subject matter of the interview. By asking about demeanor, they open the door to impeachment. And once we open the door—once the door is open to impeachment and we get to play any [p]art of the tape, even if it's just for impeachment purposes, at that point one part of the interview has been played and optional completeness applies.

The State agreed that defense counsel could ask Hauser about what she witnessed concerning Adele's demeanor, but it disagreed that counsel could elicit from Hauser hearsay statements made by Adele during the interview. The State also disagreed that it would be necessary for defense counsel to show the video to impeach Hauser. The court ruled that if the State elicited expert opinions from Hauser "regarding information gathered from the video," defense counsel would be entitled to cross-examine Hauser "by presenting pertinent sections of the video that address the expert's opinion."

During Hauser's direct testimony, she discussed different "stages" of disclosure of abuse. These stages include "tentative disclosure," in which the child is "testing the waters" and is ambivalent. The child "may share some information

but not all the information, kind of wanting to see maybe their parents' reaction." Another stage is "active disclosure," in which the child "is ready to tell everything that's happened."

Adele's demeanor during the interview was "avoidant, reserved, hesitant." Adele "struggled" to provide sensory details, and Hauser stated that it was "really difficult to get those details from her." Hauser believed that Adele was in the "tentative" stage of disclosure. She testified: "I would say she was, you know, she started off very, like, I don't know why I'm here. And there was a lot of—." At this point, defense counsel objected based on hearsay. One of the prosecutors stated:

> I think that based off the ruling, we have to go forward with putting in the video. So we're fine with not eliciting information if that's not where we're heading. We're only putting in the video because of the defense's request.

The court requested that the parties "avoid hearsay on the table until you actually seek to admit the interview," and it sustained the objection.

When questioning resumed, Hauser testified that Adele "present[ed] very avoidant which is common for a tentative disclosure." However, as the interview progressed, Adele "move[d] into active disclosure where she disclose[d] more details about the offense." Hauser did not testify concerning any specific statements about the incident made by Adele during the interview. The State did not offer the recording of the interview into evidence during Hauser's direct examination.

20

Before testimony began the following morning, the trial court stated that it had reconsidered its ruling on the admissibility of the interview. After hearing Hauser's testimony on direct examination, the court did not "think that it opened the door to defense playing parts of the video." The court therefore sustained the State's hearsay objection to the video. When asked by the court which portions of the video defense counsel had wanted to introduce, counsel responded:

> [Hauser] was talking about how the complaining witness was being timid. I wanted to play the parts where she was talking about pornography, where she was volunteering information where it wasn't a teeth pulling. She was like, I saw this porn. I knew it was bad. I knew it was porn. I knew I shouldn't have [seen] that. That her demeanor changed in that part of the video. That was very clearly not timid. At the very least, it's a question of fact for the jury.

The court informed defense counsel that if, upon cross-examining Hauser, it believed that it was appropriate to play a portion of the video, the court would "entertain your motion at that time."

On cross-examination, Hauser again testified that Adele "presented in the [t]entative stage or phase [of disclosure] where it's very ambivalent." Adele "would provide some information; but then at times, she would also say, 'I don't know. I'm not sure.'" However, it "didn't take very long" for Adele to transition from tentative disclosure to active disclosure. Hauser testified that it was not uncommon for children to "present with different affects throughout the entire interview," and she agreed with defense counsel that an abrupt change in affect would be noteworthy.

21

Hauser also testified that Adele "loosen[ed] up more towards the end [of the interview] as compared to the beginning." Throughout the interview, Adele tended to answer questions with "one or two word statements," and the interviewer had to prompt her to elaborate. Hauser agreed with defense counsel that the topic of pornography was raised during the interview. She also agreed that when pornography was discussed, Adele "volunteered information." Defense counsel did not ask the trial court if he could play any specific portion of the forensic interview during Hauser's cross-examination.

On appeal, Alvarado argues that the recording of the entire forensic interview was admissible under the rule of optional completeness "so that the conversation between the Complainant and interviewer could be fully understood." Alvarado argues that his cross-examination of Hauser "called into question [Adele's] level of disclosure and the truthfulness of her statements, calling into question the entire interview." Admitting the full interview "would have explained [Adele's] statements about having seen pornography and would help point out conflicts in [Adele's] story." Alvarado does not identify any specific conflicts between Adele's statements during the interview and Adele's testimony at trial.

No portion of the excluded interview is part of the appellate record. After the trial court sustained the State's hearsay objection and ruled that Hauser's testimony on direct examination did not open the door to admission of the interview, defense

counsel stated that he had wanted to play the portions of the forensic interview in which Adele discussed pornography because she "volunteered information" at this point in the interview and getting her to talk about this topic "wasn't a teeth pulling," unlike the other parts of her interview. Defense counsel did not make an offer of proof that contained the recording of the entire forensic interview.

To preserve error concerning the exclusion of evidence, the party must try to introduce the evidence and obtain an adverse ruling from the trial court. *See* TEX. R. APP. P. 33.1(a); TEX. R. EVID. 103(a)(2); *Castillo*, 573 S.W.3d at 881. The party must also make an offer of proof that informs the trial court of the substance of the excluded evidence unless the substance is apparent from the context. TEX. R. EVID. 103(a)(2); *Castillo*, 573 S.W.3d at 881. The offer of proof may be in question-and-answer form, or it may consist of a concise statement by counsel. *Mays v. State*, 285 S.W.3d 884, 889 (Tex. Crim. App. 2009). If the offer is in the form of a statement, it "must include a reasonably specific summary of the evidence offered and must state the relevance of the evidence unless the relevance is apparent, so that the court can determine whether the evidence is relevant and admissible." *Id.* at 889–90. Additionally, for a complaint to be preserved on appeal, the party's appellate complaint must be the same complaint that it made in the trial court. *Castillo*, 573 S.W.3d at 881; *see Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012) ("The point of error on appeal must comport with the objection made at trial.").

The purpose of an offer of proof is two-fold. The "primary purpose" is to "enable an appellate court to determine whether the exclusion [of evidence] was erroneous and harmful." *Mays*, 285 S.W.3d at 890. A "secondary purpose" is to "permit the trial judge to reconsider his ruling in light of the actual evidence." *Id.* Defense counsel stated on the record that he had wanted to play the portion of the interview in which Adele discussed pornography. On appeal, Alvarado argues that the trial court should have admitted the entire forensic interview. The recording of the entire interview was not part of defense counsel's offer of proof, nor was a "reasonably specific summary" of the contents of the interview—other than Adele's statements about seeing pornography—included in the offer of proof. *See id.* at 889–90.

Without an offer of proof that contains the entire forensic interview or a "reasonably specific summary" of the interview, we cannot determine whether exclusion of the entire interview was erroneous or harmful. *See id.* at 890. We therefore conclude that Alvarado has not preserved his complaint about exclusion of the entire forensic interview for appellate review. *See* TEX. R. APP. P. 33.1(a); TEX. R. EVID. 103(a)(2); *Castillo*, 573 S.W.3d at 881–82; *see also Montgomery v. State*, 383 S.W.3d 722, 726 (Tex. App.—Houston [14th Dist.] 2012, no pet.) ("It is the appellant's burden to make a record, through a bill of exceptions, of the evidence he or she desires admitted.").

We overrule Alvarado's third issue.

## Conclusion

We affirm the judgment of the trial court.

April L. Farris
Justice

Panel consists of Justices Goodman, Countiss, and Farris.

Do not publish. TEX. R. APP. P. 47.2(b).